IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EVERGLADES GAME TECHNOLOGIES, LLC, <br><br> Plaintiff, <br><br> v. <br><br> SUPERCELL, INC., <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) Civil Action No. 14-643-GMS |

**MEMORANDUM**

## I. INTRODUCTION

On May 19, 2014, the plaintiff Everglades Game Technologies, LLC ("Everglades") initiated patent infringement lawsuits against a number of defendants, including the above-captioned defendant Supercell, Inc. ("Supercell"). Everglades alleges that Supercell infringes U.S. Patent No. 6,656,050 ("the '050 Patent"). Presently before the court is Supercell's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (D.I. 8.) Supercell argues that the '050 Patent claims patent ineligible subject matter and is therefore invalid under 35 U.S.C. § 101. For the reasons discussed below, the court will grant Supercell's motion to dismiss.

## II. BACKGROUND

The '050 Patent—entitled "Odds Accelerator for Promotional Type Sweepstakes, Games, and Contests"— "relates to promotional gaming methods." '050 Patent, col. 1, l. 11. Most people are likely familiar with these "promotional games" in one form or another. The '050 Patent describes an archetypal example: a cola manufacturer prints letters or images on the bottle caps of its beverages. If customers collect the right combination of letters—perhaps spelling out "C-O-L-

A"—or matching images, they win a prize. '050 Patent, col. 1 ll. 49–57. For this reason, they are often referred to as "collect-and-win" or "match-and-win" games. The manufacturer—or "sponsor" of the promotion—typically sets the odds by controlling the rarity of the game's component pieces, perhaps by releasing into distribution only a very small number of letter "A"s, relative to other letters. Customers are driven to buy additional products by the off chance that their next purchase will have the winning letter or picture, thus *promoting* the sponsor's merchandise. '050 Patent, col 2 ll. 7–9 ("[T]he possibility, albeit remote, of winning a prize of significant value provides a powerful incentive to prospective patrons."). If you are willing to admit to playing the McDonald's Monopoly game, you will know that there are few things so alluring, yet simultaneously maddening.

The '050 Patent takes this concept into the digital age. It claims methods to give sponsors "total control over game piece distribution and price awards," primarily through the use of computer technology. '050 Patent, col. 2 ll. 2–3. The '050 Patent recites twenty-six claims, with two independent claims. Claim 1 recites:

> A method for increasing a player's chances of winning a game wherein the game requires multiple game pieces to be matched in a specific winning combination, said method comprising the steps of:
> receiving and inputting data for at least one game player, said data including identification of said player and at least one of collected game pieces and needed game pieces;
> facilitating acquisition of at least one of said needed game pieces by said player in order to achieve said specific winning combination;
> receiving a predetermined prize when said player acquires said winning combination, wherein said predetermined prize is automatically delivered to said player.

Similarly, claim 14 recites:

> A method enabling at least one player to increase a likelihood of winning at least one of a collect-and-win game and a match-and-win

2

> game promotion while simultaneously increasing an appeal of said game to the player and thus making a substantially more valuable system for a promoter, comprising the steps of:
> > providing at least one game piece to at least one player;
> > applying said game piece to an appropriate game board at a game site;
> > making game piece information available to said player, said game piece information indicative of needed game pieces needed to complete a winning combination of game pieces to thereby win said game, whereby the player may share or trade game pieces with at least one other player,
> > enabling said player and said other player to easily and securely store said game pieces for future use.

The remaining twenty-four dependent claims add limitations relating to the implementation of these methods, including the use of an "Odds Accelerator." "The Odds Accelerator increases participants' odds of obtaining the 'rarest' piece in a promotion type game based upon a triggering event." '050 Patent, col. 4 ll. 9–12; *see also* col. 13 ll. 29–32 ("The present invention provides the unique ability to add real-time variable odds changes to any given sweepstakes or promotion type game involving elements of chance or skill based on pre-determined sponsor rules.").

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal where the plaintiff "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In considering a motion to dismiss, the court "accept[s] all factual allegations as true, construe[s] the complaint in the light most favorable to the plaintiff, and determine[s] whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). Plaintiffs must provide sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."

3

*Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "At the motion to dismiss stage a patent claim can be found directed towards patent-ineligible subject matter if the *only* plausible reading of the patent must be that there is clear and convincing evidence of ineligibility." *Tuxis Techs., LLC v. Amazon.com, Inc.*, No. 13-1771-RGA, 2014 WL 4382446, at *2 (D. Del. Sept. 3, 2014).

Section 101 describes the general categories of patentable subject matter: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. These broad classifications are limited, however, by exceptions. "Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice*, 134 S. Ct. at 2354 (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2216 (2013)). Courts have eschewed bright line rules circumscribing the contours of these exceptions. *See id.* ("[W]e tread carefully in construing this exclusionary principle lest it swallow all of patent law. At some level, all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." (internal citation and quotations marks omitted)). The Supreme Court's decision in *Alice* reaffirmed the framework first outlined in *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S. Ct. 1289 (2012), used to "distinguish[] patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *See Alice*, 134 S. Ct. at 2355.

> First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts. If so, we then ask, what else is there in the claims before us? To answer that question, we consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application. We have described step two of this analysis as a search for an "inventive concept"—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself.

4

*Id.* (internal citations, quotations marks, and alterations omitted). Thus, the court must determine (1) if the patented technology touches upon ineligible subject matter, and (2) whether there are sufficient inventive elements such that the invention is "'significantly more' than a patent on an ineligible concept." *See DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1255 (Fed. Cir. 2014) (quoting *Alice*, 134 S. Ct. at 2355); *see also Intellectual Ventures I LLC v. Capital One Bank (USA)*, No. 2014-1506, 2015 WL 4068798, at *2 (Fed. Cir. July 6, 2015); *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015). "[A]n invention is not rendered ineligible for patent simply because it involves an abstract concept." *Alice*, 134 S. Ct. at 2354.

## IV. DISCUSSION

Everglades contends that it is procedurally improper to invalidate a patent under § 101 at the motion to dismiss stage. While in some cases claim construction and discovery may be necessary to fully understand the claimed invention, there is no rule requiring that courts wait until a certain stage of litigation before addressing patent-eligible subject matter. And it is not uncommon for courts to rule on § 101 motions at the pleading stage. *See OIP Techs*, 788 F.3d 1359 (Fed. Cir. 2015) (affirming District Court's grant of judgment on the pleadings based on § 101 invalidity); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350 (Fed. Cir. 2014) (same); *Money Suite Co. v. 21st Century Ins. & Fin. Servs., Inc.*, No. 13-1747-GMS, 2015 WL 436160 (D. Del. Jan. 27, 2015) (granting the defendants' joint motion to dismiss based on § 101 invalidity). The court considers it appropriate to do so in the case at bar.

The court applies the two-step framework outlined in *Alice* to the '050 Patent. In doing so, the court finds that the '050 Patent—and all of its twenty-six claims—are invalid under § 101, as they claim the abstract concept of using promotional games, such as collect-to-win or match-to-win, without reciting meaningful limitations to render the idea patent eligible.

## A. Abstract Idea

Following the guidance of *Alice* and its progeny, the court finds that the concept of promotional games—"random drawing sweepstakes, instant win packaging, lotteries, collect & win and match & win contests"—is an abstract idea. *See* '050 Patent, col. 1 ll. 46–48. Though perhaps some would dispute whether such games are a "*fundamental*" economic principle, there can be little doubt that they qualify as a "longstanding commercial practice" and a "method of organizing human activity." *See Alice*, 134 S. Ct. at 2356–57 (emphasis added). The '050 Patent itself notes the widespread use of promotional games in commerce: "These games are intended to drive traffic to certain locations, increase sales or usage of specific products, and/or simply to reward customers for loyalty." '050 Patent, col. 1 ll. 40–42. Promotional games are marketing tools. Though a precise definition of "abstract idea" is deliberately elusive, in the court's view, these tools fit squarely within any understanding of the category.

Everglades attempts to distance "the invention" described by the '050 Patent from the underlying idea of promotional games, but ultimately confuses the law. Everglades accuses Supercell of oversimplifying the invention, but its own characterizations prove to be no more concrete. For example, Everglades recognizes that the '050 Patent is directed to adding functionality to the "traditional collect-and-win or match-and-win promotional game." (D.I. 11 at 13.) The added functionality, however, does not render the concept of promotional games any less abstract. *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014) ("We do not agree with Ultramercial that the addition of merely novel or non-routine components to the claimed idea necessarily turns an abstraction into something concrete."). The claims' added limitations may be sufficient to make the abstract idea patent eligible, under *Alice* step two, but that is a separate analysis, discussed below. *See id.* ("[A]ny novelty in implementation of the idea is a

6

factor to be considered only in the second step of the *Alice* analysis.").[1] Everglades also argues: "Far from being fundamental economic principals [sic], these methods are meant to increase the appeal of the game to the player. The concept of 'an economic strategy' is, in short, found nowhere in the claims." (*Id.*) The court fails to follow Everglades' logic. After all, more appealing games are, in Everglades' own words, "more valuable to the promoter." (*Id.* at 3.) A more valuable marketing technique is still a marketing technique, and an abstract idea.

Finally, Everglades asserts that the '050 Patent's subject matter is not abstract because "all the claims require a specially programmed computer to implement the invention and to achieve the invention's benefits." (*Id.* at 14.) Yet again, this statement only confirms that *the invention* is the promotional game, albeit with improved functionality. The '050 Patent is directed to an abstract idea. Everglades' citations to pre-*Alice* case law do not change the court's conclusion.

## B. Inventive Concept

Not all patents directed to abstract ideas are patent ineligible under § 101. Therefore, although the '050 Patent reads on the abstract concept of promotional games, it will not be found invalid if there is evidence of an inventive concept or contribution: "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *See Alice*, 134 S. Ct. at 2355. Drawing a line between patent-eligible and patent-ineligible manifestations of abstract ideas is often difficult. *See DDR Holdings*, 773 F.3d at 1255. The recitation of "well-understood, routine, conventional activities," previously known to the industry, however, is insufficient to "transform the claimed abstract idea

---

[1] Everglades also argues that "[t]he '050 patent coverage is too specific and narrow to fall into the abstract idea category." (D.I. 11 at 14.) Again, such a statement demonstrates a misunderstanding of the *Alice* framework. Whether the claims meaningfully limit the scope of the abstract idea is relevant to step two only. Narrow ideas are not immune from being labeled "abstract." *See OIP Techs.*, 788 F.3d at 1362–63 ("[T]hat the claims do not preempt all price optimization or may be limited to price optimization in the e-commerce setting do not make them any less abstract.").

7

into a patent-eligible application. *OIP Techs.*, 788 F.3d at 1363 (internal quotation marks and alterations omitted) (quoting *Alice*, 134 S. Ct. at 2359).

The court agrees with Supercell that each of the claims of the '050 Patent lack meaningful limitations on the abstract idea. Claim 1 is a method for "increasing a player's chances of winning a [collect-to-win] game," including the steps of (1) gathering data on the player and his/her current "game pieces," (2) facilitating the player's acquisition of a required game piece, and (3) receiving and delivering a predetermined prize to the winner. Claim 14 provides slightly more context, reciting a method for "enabling at least one player to increase a likelihood of winning at least one of a collect-and-win game and a match-and-win game promotion while simultaneously increasing an appeal of said game," including the steps of (1) providing a game piece to the player; (2) applying the game piece to a game board at the game site; (3) making game piece information available to the player (*i.e.*, what pieces remain to be collected), thus allowing the player to share or trade with other players; and (4) enabling players to easily and securely store game pieces. None of these claim elements offer meaningful, inventive limitations to the abstract concept. Rather, they are ordinary functions carried out by generic computer technology, as described in the '050 Patent specification: "The numerous features and functions performed and achieved by the system according to the invention are enabled by appropriate software applications, computer hardware configurations, system network and server existence and connections, web sites, internet access, etc. . . ." '050 Patent, col. 14, ll. 7–11. Gathering, storing, and displaying data, facilitating game piece acquisition, enabling player access via an interface—the court fails to discern an inventive contribution in these claims. *See OIP Techs.*, 788 F.3d at 1363–64 ("[T]he claims' recitation of [presenting offers to potential customers and gathering statistics about how the potential customers responded to the offers] [did not] provide a meaningful limitation on the abstract idea. These

8

processes are *well-understood, routine, conventional data-gathering activities* that do not make the claims patent eligible." (emphasis added)).

The dependent claims—while further limiting the scope of the sprawling independent claims—still fare no better. Most make clear what was never explicitly stated in the independent claims: that the methods are to be implementing using nondescript computer-based systems and generic Internet architecture. "[E]ach step does no more than require a generic computer to perform generic computer functions." *Alice*, 134 S. Ct. at 2359. Everglades' own characterization confirms the court's view:

> The benefits of the claimed inventions are made possible by the use of the expressly disclosed computer system, which implements the claimed steps and elements. . . . When the '050 claims are properly construed from the vantage point of a person of ordinary skill in the art in light of the relevant intrinsic evidence, it is evident that the claims require a computer processor to perform the claimed steps.

(D.I. 11 at 20.) The "expressly disclosed computer system" is just that: an "unspecified, generic computer." *See Alice*, 134 S. Ct. at 2360. And certainly Everglades cannot argue that the use of a "computer processor" is somehow inventive in this particular context. Moreover, the Odds Accelerator is merely a byproduct of using computer technology, which allows the sponsor to monitor the game status in real-time. *See* '050 Patent, Abstract ("The present invention provides the unique ability to add real-time variable odds changes to any given sweepstakes or promotion type game . . . ."). Computerization gives the sponsor greater control over the game odds than previously possible, but this added control is not inventive, nor is it a meaningful limitation. *See OIP Techs.*, 788 F.3d at 1363 ("[R]elying on a computer to perform routine tasks more quickly or more accurately is insufficient to render a claim patent eligible." (citing *Alice*, 134 S. Ct. at 2359)).

Everglades maintains that "the claims of the '050 patent plainly do not preempt all methods of trading game pieces in the context of a collect-and-win or match-and-win game." Although

9

*Alice* did discuss preemption at length when it established its two-step analytical framework, the extent of preemption is not itself a necessary consideration. *See Money Suite Co.*, 2015 WL 436160, at *5 ("[A]lthough courts have framed the 'second-step' analysis in terms of preemption, there is no rule that ideas that do not preempt an entire field are *per se* patent eligible. Rather, the test as articulated by *Alice* is that there must be an inventive contribution on top of the underlying abstract idea."). Without an inventive concept, the '050 Patent fails under *Alice*, regardless of the scope of preemption.

Finally, Everglades confusingly argues that Supercell improperly relies on the outdated "machine-or-transformation test." *See Bilski v. Kappos*, 561 U.S. 593, 604 (2010) ("[T]he machine-or-transformation test is a useful and important clue, an investigative tool, for determining whether some claimed inventions are processes under § 101. The machine-or-transformation test is not the sole test for deciding whether an invention is a patent-eligible 'process.'"). Supercell in fact makes no mention of the test in its opening brief. Thus, there appears agreement that the machine-or-transformation test retains limited utility, except perhaps as a "useful clue" in evaluating a patent's inventive contribution and limitations to the abstract idea. *See Ultramercial*, 772 F.3d at 716. After disparaging the test's usefulness, Everglades nonetheless argues that applying the machine-or-transformation test proves that the '050 Patent recites patent-eligible subject matter. The court finds Everglades' conclusory statements to be implausible and practically incomprehensible. Despite the claims all being directed to methods of implementing a promotional game, Everglades contends:

> Because the claims inherently recite a computer programmed with software configured to conduct multiple transactions automatically and achieve multiple results, thereby enabling scalability and opportunity for the game, and enable a sophisticated monitoring and automated solution to change a collect-and-win or match-and-win promotion's odds of winning on a real-time, variable basis while

10

> making it more likely to ensure a winner(s), the machine prong is
> satisfied.

(D.I. 11 at 17–18.) The court can only scratch its head trying to decipher both the meaning of this statement and Everglades' basis for making it. Everglades' justification for why the '050 Patent also satisfies the "transformation" prong is similarly untenable. (*Id.* at 18–19.) To the extent the machine-or-transformation test remains worthy of consideration, the court finds that it fails to support the '050 Patent's validity.

## V. CONCLUSION

The court finds by clear and convincing evidence that the '050 Patent is invalid under 35 U.S.C. § 101 because it claims a patent ineligible abstract idea. The court will grant Supercell's motion to dismiss. (D.I. 8.)

Dated: August 21, 2015

_____
UNITED STATES DISTRICT COURT